Please the court, my name is Steven Montoya. I'm here representing the appellant, the plaintiff below, Michelle Salazar. I think that this is a very important case in the Ninth Circuit, substantively and procedurally. Substantively, and the two issues are intertwined because this is an appeal from a motion for summary judgment. This is an important case because the discrimination set forth in the record below, and I say set forth rather than alleged, because there was substantial evidence of record in the proceedings below, presented to the district court in the papers regarding the case. It can be fairly characterized as pervasive. It can also be fairly characterized as severe. You have a lady who is white, who is married to a Hispanic, who is subjected to a series of very, very offensive racial and slash sexual remarks for a sustained period of time by her supervisor, and virtually nothing was done about it. After she complained, nothing was done about it. I didn't complain for a considerable period of time either. It was approximately, Judge Berzin, over four years, during the entirety of the tenure of Cynthia Baxter's supervision of Michelle Salazar. During that same time period, Michelle Salazar was also subjected to considerable other harassment, which is significant because it shows the pervasiveness of the harassment in question, and it also shows... Let's take two things about the sexual. I mean, there was certainly a lot of very unpleasant remarks going on, but two things. A, they don't appear to have been directed at her in a sex-discriminatory manner. Do you think that's right? I think that is right with important qualification. Some of the remarks were racial-sexual. For example, some of the remarks describing the reproductive organs of a particular ethnic or racial group were sexual-slash-racial, and they did pertain to her insofar as they pertained to her race. The kiss on the head was directed towards her. And another important point in that... My second question is why doesn't this look, at least for a lot of it, maybe not all of it, as the situation in which the Farragher-Ellerth affirmative defense is available, and because there was no complaint by the no official complaint to hire up the latter for a very long time? I mean, maybe at past some point she would be, they could be liable, but what about for a lengthy period of time that nothing was said? Let me respond to that at several levels. First of all, the district court never reached that issue, of course, because the district court concluded... That's summary judgment, and we could reach it on the record. Correct. The district court didn't reach that issue. Second of all, she did complain. She did complain, and she did complain in writing. Third of all, she complained initially to Ms. Baxter on July 30th of 1998. Almost immediately thereafter... I mean, A, which was already a couple years after it had been happening, right? Yes, Your Honor. And then she subsequently and shortly thereafter complained formally and in writing. And after she complained, did it stop? No, Your Honor. Ms. Baxter stopped making offensive remarks at work. However, instead of the sexual slash racial harassment that Ms. Baxter imposed upon Ms. Salazar, now she started to impose what I would describe in accordance with this court's opinion in Ray v. Henderson as retaliatory harassment. And one that I really do want to get into, but I'm trying to start where you started, which is with the sexual or racial harassment issues. Yes, the sexual slash racial harassment stopped after she complained. And that's the point of the Ellerth-Faragher. That's part of the point, Your Honor. However, I think another... Let me try and stop the... Now, as I understand the defense, that doesn't mean if she had complained that they would be home free. If the harassment had occurred in the past and the defense isn't available, they can be responsible even if they do have a good system, and even if they first found out about it then. Well, because I think under Faragher and Ellerth, the remedial measures must be prompt, and they must be effective, and they must preclude retaliation. But she complained, it stopped. Let's leave the retaliation aside. Well, Your Honor, and it really didn't stop, because she continued to have to work under Ms. Baxter, and she continued, at Ms. Baxter's behest, to have to work with Lt. Ares, who had grabbed her and who had kissed her, and whom she had asked not to have to work with, and whom Ms. Baxter basically said, too bad, you have to work with this guy. Your problem with him is, quote, a personal one, unquote. But now you're switching gears. I mean, I'm trying to focus on one question at a time. Your Honor, I think that Your Honor raises a good point. The sexual-slash-racial comments did stop. However, looking at the totality of circumstances, the hostile working environment was not cured. And this Court, in accordance with the Supreme Court's opinions regarding this issue, has admonished the district courts and the courts of appeals to look at the totality of circumstances. And I know that Your Honor has said that you want to look at retaliation separately, and I think that's a logical thing to do in reference to adverse employment actions. However, in reference to something quite different, something called retaliatory harassment, which once again is actionable under this Court's opinion in Ray v. Henderson, that you can't logically separate the two. Adverse employment actions constitute retaliation on one hand, but retaliatory harassment, on the other hand, also constitutes retaliation violative of Title VII. Can I ask some facts with regard to the retaliation? Now, what is the first protected act by Ms. Salazar after which acts could be potentially retaliatory? The first protected act, Judge Fletcher, would have been on July 30th of 1998 when Ms. Salazar asked Ms. Baxter to please stop speaking that way. She made earlier complaints, though. Wasn't her complaint about the male harasser earlier? It was multi-pronged. However, it's specifically related to Ms. Baxter. And she had made a series of complaints, but that's the complaint that she made to Ms. Baxter. And right after that, literally weeks after that, for the first time in this lady's lengthy and distinguished career with the federal government, she received these minimally satisfactory entries in her performance log, which, unlike the district court has said, were not temporary. They were permanent. They were never removed. Is there anything in the record in which the government has countered Ms. Salazar's submissions from the people who supposedly I don't think there was. No, Your Honor. And I would like to reserve what's little left of my time for rebuttal. There's enough factual stuff here. I'd like to pursue this for a moment, and then we'll save you a minute. Yes, Your Honor. I can see at least two pieces of evidence or clusters of evidence that might be considered retaliatory. One is you left the material in the Xerox machine, these minor write-ups. The second one is the overall performance reviews. Previously she had been getting outstandings. Now she's getting what are called in the jargon exceeds. Yes. But I look at that date, 98. She had been getting outstandings, but Ms. Baxter had given her an exceeds rating in 97 before the first act that you allege is an act against which she's retaliated. Does that mean that the remainder of the exceeds evaluation, she was then gone for a couple more years, and the remainder of the exceeds and the remainder of the outstandings, that she didn't get, they stay at exceeds until she finally gets supervised by Holmes and gives her an outstanding exam? What am I to make of the fact that she gets an exceeds, quote, exceeds overall evaluation before July 30, 98? Well, Your Honor, I think that's a very good point. And I think that only a finder of fact can resolve that issue. When was the first one? Was it 98 or 97? The first exceeds was 1997. The second one was 1998. And the third one was 1999. After Ms. Baxter retired, as Judge Fletcher points out correctly, she went back to outstandings. And I think that's a question of fact. And that's when she was reviewed by somebody else because Ms. Baxter finally retired. I think that the second one was also before the July 98. No, no, Your Honor. The second one was after. See, from what I can tell, I'm looking at Ms. Salazar's statement of facts. She says that the first exceeds was in April of 98, not in April of 97. Is that wrong? The first exceeds, yes, was April of 1998. As Judge Fletcher points out, that was before she complained about Ms. Baxter. But after she had already made some complaints. Correct. Regarding Mr. Aries, yes. And I think that's a question of fact, especially in this case, because Ms. Baxter is of record saying, I am mad at this lady. Is that accurate? I mean, Judge Fletcher was the – is this correct, or is there something in the record that contradicts it? That the April of 98 was the first exceeds. Is there anything in the record that contradicts that? No, there is not. That's a question of fact, especially when Ms. Baxter once again is of record saying that she is mad at Ms. Salazar. Moreover, there's another – yeah, that was after the first exceeds, but right after the second one. And moreover, there was another – well, there were two other retaliatory acts. First of all, Ms. Salazar needs a typewriter to do her job. After she complained about Ms. Baxter, that office was locked, and that prevented Ms. Salazar from doing her job. Third of all, because of the four minimally satisfactory injuries that Ms. Baxter placed in Ms. Salazar's file immediately after she complained, literally weeks after, and that propinquity is very relevant, because these courts – your opinions constantly say closeness in time is very relevant as to the question of retaliation. She received these exceeds, and then she didn't get any promotions. And even though Salazar was of record saying that she was mad at Ms. Baxter, she didn't get any promotions. Some of the individuals who were promoted above her did have degrees and did have more experience. Not all of them did. What do we know in the – it seemed to me, frankly, that the earlier promotions are difficult because those were in 1997. They were before even the first exceeds, weren't they? Yes, they were. However, the last promotion – The last one is, as Your Honor points out, our strongest case. There we have someone who had less experience with the Bureau than Ms. Salazar, who was two grades below her, who had never been – who had never served in that office anywhere, and had certainly never served in that office in Phoenix, who got the job over Ms. Salazar. Does the government have any response or explanation on that promotion? That one was after the case was filed, right? Yes, Your Honor. To my knowledge, no. I think that they said that the other three individuals had more varied experience and had baccalaureate degrees, but Ms. Holmes didn't have that varied experience, did not have an advanced degree, and in fact had substantially less experience than Ms. Salazar. So I think that is another question of fact that has to abide for the finder of fact. I think we now have it in the hand. Let's hear from the other side, and we'll give you a chance to respond. Yes. Thank you, Your Honor. Thank you. May it please the Court. Mark Wanker for the United States Department of Justice and the Federal Bureau of Prisons. First addressing the – Can I ask you an idle question? Yes, Your Honor. Why is the whole record in this – and the brief sealed in this case? I'm not the trial attorney, so I can't speak to that. I really don't know, Your Honor. I was reviewing the pleadings last night, and I had the same question. Maybe opposing counsel can answer that in a rebuttal. It's a problem for us in writing an opinion and so on, if we want to write an opinion. I understand. Opposing counsel mentioned that there was substantial evidence in the record. There's factual issues. And the last factual issue and the biggest factual issue, he alleges, is the fact that Ms. Salazar did not get this last promotion. And that was the position that Ms. Baxter, the alleged harasser, she retired. Ms. Salazar applied for that position. There's allegations that Ms. Holmes, who ultimately was selected for that position, didn't have the experience as Ms. Salazar, and she wasn't qualified. Your Honors, that's not the case. And if I could just point to, and this wasn't in our supplemental excerpt of the record, but in the clerk's record, document 48, which was the defendant's statement of facts in support of our motion for summary judgment, Exhibit 69, that contained there were three applicants or three applicants that made the most qualified list for Ms. Baxter's old position. Ms. Salazar was one of the three. And parenthetically, I think that defeats the argument that her poor, supposedly poor evaluation, which was an exceeds, caused an adverse action. Every time she applied, she was selected for the most qualified list. But in Exhibit 69, Your Honor, that also has Ms. Holmes' application and her last evaluation. She worked in Beaumont, Texas, for another Federal Bureau of Prisons facility. She worked there, and she worked in Tennessee at another Federal Bureau's complex. So she had extensive experience in two facilities. And in her last evaluation at Beaumont, which was part of the record submitted to the court, in which the selection committee used to rate the three finalists, her supervisor in Beaumont said, on several occasions, Roseanne has served as the acting assistant and employee development manager. That's what she was applying for. That's what Ms. Baxter was, where she obtained excellent results. She had performed in this position in Beaumont. And so had Ms. Salazar, had she not? She had. But there are allegations that Ms. Holmes was unqualified. She was completely qualified for this position, at least as qualified as Ms. Salazar. There were legitimate, non-retaliatory reasons. What were they? One, she had more experience. She worked in at least two facilities. She had worked in this position, the employee development manager, and as the assistant employee development manager position in Beaumont, Texas. She did an excellent job. She was rated most qualified by, and mind you, the people. Isn't that the issue? The issue is whether there was something about the fact that Ms. Salazar had now these three less than stellar evaluations, when she had previously had stellar evaluations, and that may be why, on paper, she looked less qualified. A couple things, Your Honor. One, to my knowledge, the rating system used by the Federal Bureaus of Prisons, there is outstanding. That's the highest. And then ---- You're telling us that Ms. Holmes was rated as outstanding. I ---- And Ms. Salazar wasn't. I'm not sure what Ms. Holmes' final evaluation is. What I'm saying is that she was qualified for this position. There's been representations that Ms. Holmes was unqualified. That's not the case. Unqualified, qualified. Those are tricky words. These are comparative judgments when we get to this point. They are all qualified in the sense that if Ms. Holmes dropped dead, Ms. Salazar could have been chosen and vice versa. The question that's relevant to us is a comparative question. Who is better suited? And if they're equal, why is one chosen over the other? And so it's not a sort of a bare qualification at this point. Your Honor, one thing that must be kept in mind, because this goes to the retaliation that Ms. Salazar engaged in protected activity, there was an adverse employment action, which they're claiming she wasn't selected for these positions, and there's a causal link. For all these positions, the people selecting had no knowledge that Ms. Salazar ever filed any EEO complaints. None. There's no evidence of any causal links. What did they have in terms of her file? I assume they had the overall performance evaluations, her earlier outstandings, her later exceeds. The final outstanding that she gets is only from Ms. Holmes. So that one they do not have, because that's appointed, that's done by the person that gets the job. Do they also have those minimal performance evaluations, left the paper in the copier sort of thing? Do they have that in front of them as they're making their decision? There's nothing in the record, Your Honor. My understanding, and I think this is pretty much standard throughout the federal government, is if you apply for a transfer, you complete the application, you explain how you can meet the requirements, and your latest evaluation is attached to your application. And that's what's in the record. When I said – Do they have a poll behind that? I'm sure they do. Excuse me, Your Honor? Do they have a poll behind whatever paper is submitted? They don't go and ask people about the individual? I suppose that is done on occasion. They can interview. But the important thing, Your Honor, is that those minimal – Well, let me make sure I'm narrowing this down, and Mr. Montoya can disagree if he wants to point me to something else. You're saying that there's nothing in the record that shows that the decision makers for this job that Ms. Holmes finally got knew of anything other than her final piece of paper, her final overall evaluation, her final exceeds? That's correct. All the decision makers – Her earlier exceeds they didn't know, her earlier outstanding they didn't know, these minimal evaluations they didn't know. You're saying there's nothing in the record that shows they knew any of that? I don't know that, Your Honor. What I'm saying is they were unaware that Ms. Salazar had ever engaged in protected activity. That's a different question. I want to make sure I got you on the question I asked, which is to say you're telling me there's nothing in the record that tells us that these decision makers had in front of them the pieces of paper that gave her earlier overall evaluations of outstanding and exceeds, except for her last one, and there's nothing in the record that tells us they had the piece of paper that shows the minimal evaluations. Now, you can say you don't know, but I want to know what the answer is to that specific question. At least with regard to the minimally satisfactory performance logs, to the best of my knowledge, there's no evidence in the record and that would have not been presented to them because those were interim evaluations. That did not transpire onto her yearly evaluations. Your answer is there's nothing in the record that shows that they had that. I'm not aware of anything, Your Honor. Okay. Now, the – what's important also about the minimally satisfactory are that, first and foremost, they were interim, and under Brooks, this Court held that interim actions are not sufficiently final to constitute an adverse action. Now, that might have been confined to the facts of that case because the overall test that Brooks was applying is the Ray v. Henderson test, which is to say reasonably calculated to deter. So I can imagine a case, and I'm not sure this is such a case, but I can imagine a case where the person makes a protectant complaint. The supervisor immediately thereafter writes up that person for four nitpicky little violations and says, these are not going to show up in the final thing, but I'm doing this right now because I'm telling you, if you continue, that's what's going to happen to you. Now, that sounds to me like something reasonably calculated to deter, even though it doesn't in the end show up in the final evaluation. Now, that may or may not be the case here. I'm making up some stuff to make it a little cleaner. Theoretically, that's possible, but, again, that's not what happens here. And the facts of Ray, although this Court in Ray said that an adverse action can be that which would reasonably likely deter others from engaging in protected activity. Say others? It doesn't have to be others. It could be the same people. Yeah. I believe the opinion said adverse action could be construed to be that which reasonably likely could deter others from engaging in protected activity. But the examples that this Court gave in that case were things such as refusing to give lateral transfers, negative references, which here Ms. Salazar received exceeds, which is three levels above a negative and unsatisfactory. Two levels. Is there anything in the record? This is coming out of my own experience, which may not translate. So this is really the background for the question rather than an implied answer. When I was in the military, it was well understood that if you were an officer and you got anything below an outstanding rating in terms of what your superior officer was rating, your career was you were headed out one of these days. Do we have anything in the record that tells us what the vocabulary of rating is within the prison system? That is to say, it's possible that exceeds means, you know, you didn't do very well. Your Honor, my time's up. Can I bring up? I don't think there's anything in the record, but I have not seen any authorities and I haven't seen appellate cite any authorities stating that an exceeds is an adverse action. And here it couldn't have been because she was recommended, she was on the most qualified list for the two Georgia positions and she could be on the most qualified list. But in the end, the difference between who gets chosen and who doesn't get chosen may be the difference between who is outstanding and who is exceeds, as silly as that may sound. Because we all know that. I mean, I know when I hire law clerks, I have a hiring between A and A plus, right? So I'd rather hire the A plus usually. That doesn't just say the A person couldn't do a perfectly good job. And they might be on my short list, but they're not the one I chose. Again, theoretically, that could happen. The facts here were that Ms. Holmes was capable, qualified. She had acted in this position before. She was commended for acting in this position before. And I don't think there's any dispute about the two vacancies in Georgia, and there were a total of five vacancies, two announcements, that all those selectees had either undergraduate degrees and postgraduate degrees and much more extensive experience. While your time is up, could you very briefly address the sexual and racial harassment? Are you relying on the sexual and racial harassment claims? Are you relying on the affirmative defense? Are you relying on the fact that these were not directed at her? Or are you relying on the fact that it wasn't sufficiently pervasive? What is your basic argument? All of the above, Your Honor. These comments were offensive and vulgar. There's no doubt about them. But they were not directed at Ms. Salazar. They do not rise to the level of other Ninth Circuit cases where they were directed at something. In fact, I don't even think the comments were directed at Ms. Salazar's gender. They were just comments by Ms. Baxter about her sexual preferences about men and what she likes to do. Again, offensive. Was it hostile? Not by this Court's standards in other cases, including in Sanchez, Your Honor. Thank you. Thank you very much, and we apologize for taking you over your time. I'll try to be brief. First of all, some of these comments were directed towards her. Ms. Baxter considered Ms. Salazar more Mexican than white. Mexicans are not as mouthy as black females. Mexicans always do what they are told. Ms. Salazar is white. When they are wet, white people smell like wet dogs. You're one of the few white people that I've ever met that I like. My God, if a white person told a black person that, I would hope that that would violate the civil rights laws under this Court's opinions. So some of these clearly were directed towards her. Regarding her failure to complain in the Farragher defense, Your Honor, the Farragher defense is also predicated upon a good-faith anti-discrimination policy. And I think the record in this case, if you look at the totality of circumstances, is clear that you can basically do almost anything that you want at that particular prison and get away with it, especially if you're a supervisor, including watching pornographic movies, having pornography on the desk, asking the female employee what's the weirdest place she ever had sex in. Mr. Aries grabbed Ms. Salazar and kissed her, and he was not punished because there was no corroborating evidence, even though he had done the same exact thing to another woman and they found evidence in that case. So the Farragher defense only applies if there's some evidence that there is a good-faith policy in place. There's no such evidence in this case, and they have the burden of proof in reference to that. The time is running on us. In fact, we're over. But let me ask you the same question. Can you point me to anything in the record that tells me precisely what that evaluation committee had in front of it as it was choosing between Ms. Salazar and Ms. Holmes, and I guess among them there must have been a third. No. However, I think that they had access to the personnel file, and those four minimally satisfactory entries were in the personnel file because that's where I got them. Second of all. Okay. Now, but I asked you not what you think. I asked what's in the record. Correct. And I don't know, Your Honor. But drawing inferences. Whether or not they had access to the personnel file. Is that in the record? No, Your Honor. But I believe that construing the inferences in Ms. Salazar's favor, they would have access to the personnel file. Moreover, once again, those four minimally satisfactory marks were not interim. They were constituent parts to the exceeds grade. Just like midterms are not interim, they're not your final grade, but they're not an interim grade either. Your final grade is based on interim performance. And second of all, that would deter. And that's the question. Would a reasonable employee be deterred by these minimally satisfactory entries? It might depend on whether they were ever used for anything or whether they were thrown in the garbage. Well, Your Honor, construing the facts and the inferences in Ms. Salazar's favor, and that's why this is an important case procedurally, I think that you have to say that a jury is going to have to decide that. One last question. Can you help us out? Why do we have these things sealed? Thank you for reminding me. The U.S. Attorney's Office, at the threshold of these proceedings, wouldn't release any personnel files to us or any of those affidavits, which are now part of the record, unless we agree that they be submitted under seal. Because according to the United States Attorney's Office, they were confidential under a federal regulation. Not wanting to get into a big dispute regarding that that was not related to the merits, I agreed. Because those affidavits and some of the other materials are part of federal personnel files, they wanted them under seal. Well, if we end up writing an opinion in this case, that poses some difficulties. What this Court has done in some analogous situations is to call witnesses by a letter denomination. Witness A testified. I see. Okay. Thank you. Thank you. Thank you. Thank you both for a helpful argument. The case of Salazar v. United States Department of Justice is now submitted. The last case on argument for this morning is Ramon v. Kern High School District.
judges: T.G. Nelson, W. Fletcher, Berzon